UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LEONARD HIGGINS,

        Plaintiff,

    v.                                                                                    Civil No.  06-1132-HA

PRISON HEALTH SERVICES, INC; TONY                        OPINION AND ORDER
CARNEVALE, M.D.; GARY GELARDO,
A.N.P; LORI HORTON, R.N.; MICHELE
SCHOLL; ROB GORDON, Washington
County Sheriff; and WASHINGTON
COUNTY,

        Defendants.

---

HAGGERTY, Chief Judge:

      Before the court are cross-motions for summary judgment [19, 24] in this 28 U.S.C. §

1983 action for alleged violation of the Eighth and Fourteenth Amendments in the treatment of

plaintiff's pain while he was incarcerated.[1]  After considering the arguments and evidence before

---

     [1] Claims against defendants Michele Scholl, Rob Gordon, and Washington County were
dismissed by stipulation [15].

1  - OPINION AND ORDER

the court, plaintiff's motion [24] is denied, and defendants' motion [19] is granted.

## I.    BACKGROUND

On summary judgment, the court must view the facts and draw inferences in the manner most favorable to the non-moving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

### A.    Uncontested Facts

Plaintiff was held at Washington County Jail (WCJ) from July 2004 until October 14, 2004.  Medical care at WCJ is provided by defendant Prison Health Services, Inc. (PHS). Defendants Gary Gelardo, A.N.P., and Lori Horton, R.N., are employees of PHS, and defendant Tony Carnevale, M.D., is an independent contractor.  Gelardo and Carnevale are the "medical providers" at WCJ, and Horton serves as a registered nurse.  Carnevale, as the medical director, is ultimately responsible for all care at WCJ.  He visits the facility once every seven to ten days. Gelardo, who has authority to write prescriptions, works on-site at WCJ and is present for about eight hours per day from Monday to Friday.

On August 12, 2004, plaintiff filed his first Healthcare Request Form (HCR), in which he complained of a sharp stabbing pain and diminished movement and strength in his hip.  Gelardo saw plaintiff on August 14, 2004, diagnosed his ailment as "prolonged muscle strain."  Based on his diagnosis, he increased plaintiff's Ibuprofen prescription to 1800 mg a day for two weeks. Plaintiff agreed with this course of treatment and was told to return to the clinic if there was no improvement.

Plaintiff filed another HCR on September 16, 2004, complaining of constant discomfort and an inability to walk.  He was seen by an unknown person and placed on "off work status until seen."  He filed another HCR the next day, complaining of a great deal of pain and an

inability to sleep or move.  On September 18, 2004, Gelardo prescribed him 800 mg of Ibuprofen and 975 mg of Tylenol.  On September 19, 2004, a nurse called Dr. Carnevale and Vicodin, a pain reliever, was prescribed for plaintiff.  The Vicodin was discontinued on September 20, 2004.  On that day, Gelardo saw plaintiff and noted that he was in a wheelchair and had bruising and swelling in the hip area.  Gelardo was unable to perform a range of motion exam because of pain in the hip.  Gelardo noted that there was a "[q]uestion of bursitis," and prescribed Prednisone, a steroidal anti-inflammatory, to reduce inflammation.  He also ordered an x-ray of plaintiff's hip and told him to check back in a few days.  Plaintiff was moved to the Medical Observation Unit at WCJ, where he remained until he was released.

Dr. Carnevale first saw plaintiff on September 29, 2004.  He reviewed the x-ray report, which suggested a follow-up to help exclude the possibility of an occult fracture.  He did not order a follow-up x-ray.  Dr. Carnevale changed plaintiff's medication, prescribing Indocin, an anti-inflammatory and painkiller, instead of Ibuprofen, and increasing the dosage of Prednisone. Plaintiff filed another HCR on October 3, 2004, complaining that his medication was ineffective. He saw a physician's assistant on that date and stated that the Prednisone and Indocin did not relieve his pain.  On October 3, 2004, Dr. Carnevale presecribed Flexeril,[2] and extended the Indocin prescription through October 10.

Plaintiff filed another HCR on October 8, 2004, asking that he see a doctor and that he be given medication that was effective to treat his pain.  Horton noted that his pain was rated 10 out of 10 and placed him on the list to see a medical provider.  Plaintiff filed a second HCR on the same day, stating that the anti-inflammatory medication did not work and asking for medication to treat his pain.  Horton noted in her observations of plaintiff that his limp "markedly decreased"

---

[2] Plaintiff claims that he was given only one dose of Flexeril, an antispasmodic medicine used to treat muscle spasms.

when he was not being observed.  Horton Dep. at 23.

Plaintiff again filed an HCR on October 9, 2004, seeking relief from pain and assistance from a doctor.  Horton noted plaintiff's limp and constant hip pain, and she palpated his hip area to evaluate it.  She observed that the indicia of pain were reduced when plaintiff did not think she was observing him.  Horton did not consider his condition to be an emergency.  She placed plaintiff on the clinic list for Monday, October 11, 2004.

Plaintiff filed his final HCR on October 10, 2004: "Is there anybody listening.  I am in excruciating pain through my entire right leg.  Can somebody please call the doctor and get me something for the pain!"  Higgins Decl. Ex. A. at 10.  Horton's written response noted plaintiff's multiple requests over a three day period, and his request for a wheelchair.  Horton did not provide him with a wheelchair, despite the fact that she believed that he was experiencing severe pain and that he was not feigning pain in order to get access to drugs.

On October 12, 2004, plaintiff was seen by Gelardo, who was uncertain how to proceed and scheduled plaintiff to see Carnevale the next day.  Carnevale prescribed Vicodin for plaintiff on October 12, 2004, and saw him on October 13, 2004.  At that time, plaintiff was still using a walker, and Carnevale decided to refer him to an orthopedist.

Plaintiff was released to Washington County Community Corrections on October 14, 2004.  Thereafter, he was diagnosed with multiple myeloma and a hip fracture.  He underwent a hip replacement surgery and has been medicated with Roxicet and Oxycodone, which control his pain.[3]

**B.    Contested Facts**

Plaintiff claims that he was "segregated from the rest of the jail population and unable to

---

[3]  Defendants do not contest the facts in this sentence, but they state that they have no independent knowledge of the facts.

participate in activities that were available to the rest of the population" while he was in the

Medical Observation Unit.  Higgins Decl. ¶ 6.  He further claims that he was unable to work, and

that to move around, he had to use a wheelchair, crutches, or a walker.  Further, he claims that if

non of those items were available, he had to hop on one leg to move.  Higgins Decl. ¶¶ 5, 7.  All

of these claims are denied by defendants.  Plaintiff claims that on September 29, during his visit

with Dr. Carnevale, the doctor performed a range of motion test that was extremely painful.

Plaintiff claims that Horton failed to call a medical provider in response to his HCRs on

October 8–10, 2004.  Horton is "pretty sure [she] called a provider and they said no" to the

wheelchair request.  Defendants also argue that Horton's job duty was to use her nursing

judgment in response to HCRs, and that she responded to plaintiff by speaking with him,

palpating the painful area, and doing range of motion tests.  In her original deposition, Horton

could not recall whether or not she called a medical provider about plaintiff's pain on October

8–10, 2004.  She now asserts that she did call a provider and that she was instructed not to give

plaintiff any further pain medication.  Horton Decl. ¶ 2.

Plaintiff also claims that Horton violated nursing protocol by failing to give him over-

the-counter Tylenol and failing to offer him a hot compress.  Horton contends that she was not

bound by the PHS protocols and that she was authorized to depart from the protocols if she

deemed such a departure necessary based on her nursing judgment.  Horton Decl. ¶ 3.

Defendants claim that when Dr. Carnevale saw plaintiff on September 29, 2004, he did

not order another x-ray because he did not believe that it was clinically indicated.  They argue

that the most common cause of hip fracture is trauma, and Dr. Carnevale had no reason to think

that plaintiff's hip was fractured.  Defendants argue that Carnevale's "thought process" regarding

plaintiff was that he was "at an age and had an x-ray consistent with arthritis of the right hip,"

Carnevale Dep. at 66, and that all along, Dr. Carnevale had intended to refer plaintiff to an

5   - OPINION AND ORDER

orthopedist if the symptoms did not subside.  Defendants also claim that on October 1, 2004,

Gelardo gave plaintiff an extra mattress and blankets to help reduce his hip pain.

## II.    ANALYSIS

### A.    Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(c).  As noted previously, the court must view the facts and draw inferences in the

manner most favorable to the non-moving party.  *Diebold, Inc.*, 369 U.S. at 655.  Defendants, the

moving parties, bears the initial burden of demonstrating the absence of a genuine issue of

material fact for trial, but they need not disprove the other party's case.  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 256 (1986).  When the non-moving party bears the burden of proving

the claim or defense, the moving party can meet its burden by pointing out the absence of

evidence of a genuine issue of material fact from the non-moving party.  *Musick v. Burke*, 913

F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the "adverse party may not rest upon the mere

allegations or denials of the adverse party's pleading, but the adverse party's response, by

affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is

a genuine issue for trial."  Fed. R. Civ. P. 56(e); *see also Anderson,* 477 U.S. at 248-49.  There

must be specific, admissible evidence identifying the basis for the dispute.  *S.A. Empresa de

Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1980).

### B.    Discussion

#### 1.    Deliberate Indifference

Defendants move for summary judgment, asserting that plaintiff's claims of deliberate

indifference against the individual defendants fail as a matter of law.  Conversely, plaintiff

moves for summary judgment asserting that the care provided by the individual defendants

constitutes deliberate indifference as a matter of law.

### i.      Legal Standard

It is well established that deliberate indifference to serious medical needs of a prisoner is

a violation of his or her Eighth Amendment rights.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

The Ninth Circuit uses a two-part test for deliberate indifference.  *Jett v. Penner*, 439 F.3d 1091,

1096 (9th Cir.  2006).  "First, the plaintiff must show a serious medical need by demonstrating

that failure to treat a prisoner's condition could result in further significant injury or the

unnecessary and wanton infliction of pain."  *Id.* (quoting *McGuckin v.  Smith*, 974 F.2d 1050,

1059 (9th Cir. 1991)) (quotations omitted).  "Second, the plaintiff must show the defendant's

response to the need was deliberately indifferent."  *Id.*

Evaluation of whether a response was deliberately indifferent, in turn, requires a two-step

showing.  First, the plaintiff must show that there was "a purposeful act or failure to respond to a

prisoner's pain or possible medical need."  *Id.*  Second, harm must arise from that indifference.

*Id.*  But, "an inadvertent or negligent failure to provide adequate medical care alone does not

state a claim under § 1983."  *Id.* (quotations and internal alteration omitted).  "Mere medical

malpractice does not constitute cruel and unusual punishment."  *Hallett v. Morgan*, 296 F.3d

732, 744 (9th Cir. 2002).  The inquiry into deliberate indifference is individualized.  *Leer v.*

*Murphy*, 844 F.2d 628, 634 (9th Cir. 1988).  Thus, plaintiff must make a specific showing for

each individual defendant.  *Id.*

### ii.      Application

Here, there is no dispute that plaintiff had a serious medical need.  The only question is

whether each of the individuals was deliberately indifferent.

Plaintiff's allegations about Horton center on events over the weekend of October 9-10, 2004.  Horton was aware that plaintiff was in pain, though at the time she believed, based on her observations, that he may have been feigning more pain than he actually experienced.  The uncontested facts show that Horton saw plaintiff a number of times in response to HCRs that he filed.  They also show that she met with and evaluated plaintiff's pain.  It is unclear whether Horton contacted a medical service provider regarding plaintiff's pain medication and requests for medication and/or a wheelchair.  However, she did place him on the clinic list for the following Monday.  Viewed in the light most favorable to the plaintiff, the record shows that Horton was responsive and attempted to help plaintiff.  While she may have erred by not recognizing the degree of pain suffered by plaintiff and summoning emergency aid, nothing indicated that her actions were taken with the purpose of depriving plaintiff of care.  These are not the "exceptional circumstances that approach failure to provide care at all" required to state a violation of the Eighth Amendment.  *Shields v. Kunkel*, 442 F.2d 409, 410 (9th Cir. 1971).

When Dr. Carnevale was initially called and told of plaintiff's complaints of persistent discomfort and pain, he prescribed Vicodin.  He did not see plaintiff in person until ten days later, when he viewed plaintiff's x-rays.  In his deposition, Dr. Carnevale expressed his view that a hip fracture was not consistent with plaintiff's situation, because fractures are typically a symptom of trauma.  There is no evidence in the record to show that this diagnosis was purposefully incorrect, or even medically unsound.  The fact that plaintiff was later found to have a hip fracture as a result of multiple myeloma is not probative of whether Dr. Carnevale purposefully failed to diagnose plaintiff correctly.  There is no evidence that Dr. Carnevale's course of treatment after seeing plaintiff was designed to purposefully subject plaintiff to pain.  Further, nothing in the record indicates that Dr. Carnevale knew about plaintiff's intervening HCRs and pain complaints until he saw him again in October.  In any case, he saw plaintiff

shortly after the weekend of October 9-10, 2004, and decided to refer him to an orthopedist.

Similarly, the record shows that Gelardo was responsive to plaintiff on each of his three visits. Plaintiff suggests that Gelardo's discontinuation of Vicodin on September 20, 2004, is a basis for finding that he was deliberately indifferent to plaintiff's pain. However, at that same appointment, Gelardo diagnosed him as possibly having bursitis, prescribed Prednisone, and sent him for x-rays. Nothing in the record suggests this was a purposefully incorrect course of medical treatment. Viewed in the light most favorable to plaintiff, these facts again fail to rise to the level of an Eighth Amendment violation.

There is no question that the medical providers failed to recognize that plaintiff's symptoms were the result of a very serious malady. This court cannot offer an opinion regarding whether those failures constitute medical malpractice. However, the undisputed record here does not rise to the level of exceptional failure to care for an inmate that constitutes a violation of the Eighth Amendment as applied to the states through the Fourteenth Amendment.

### 2.    Medical Care Policies

Defendants move for summary judgment on the claims against PHS. Plaintiff alleges that PHS was deliberately indifferent because it "had no policy and/or procedure in place regarding treatment of chronic and/or severe pain," or "for the treatment of acute medical conditions and the associated pain." Am. Compl. ¶¶ 23, 24. Plaintiff concedes that his complaint does not state a claim for respondeat superior liability. The Ninth Circuit has "consistently . . . found that a [municipal entity's] lack of affirmative policies or procedures to guide employees can amount to deliberate indifference, even when the [entity] has other general policies in place." *Long v. County of Los Angeles*, 442 F.3d 1178, 1189 (9th Cir. 2006).[4] "To impose liability against a

---

[4] PHS, as the operator of the jail's health services, is subject to municipal liability.

[municipal entity] for its failure to act, a plaintiff must show: (1) that a [municipal] employee violated the plaintiff's constitutional rights; (2) that the [entity] has customs or policies that amount to deliberate indifference; and (3) that these customs or policies were the moving force behind the employee's violation of constitutional rights." *Id.* at 1186 (citing *Gibson v. County of Washoe*, 290 F.3d 1175, 1193-94 (9th Cir.2002)). Here, as explained above, there was no violation of plaintiff's constitutional rights by the individual defendants. Accordingly, even if plaintiff's allegations are true, summary judgment for PHS is warranted.

**III.    CONCLUSION**

For the foregoing reasons, plaintiff's motion [24] is DENIED, and defendants' motion [19] is GRANTED.

IT IS SO ORDERED.

DATED this __19__ day of November, 2007.


    __/s/ Ancer L. Haggerty____
         Ancer L. Haggerty
    United States District Judge

10 - OPINION AND ORDER